```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____             │
│ DATE FILED:  7/1/2024                │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                               :

STEFANOS KASSELAKIS,             :
                               :

                     Plaintiff,    :

                               :                        1:23-cv-2756-GHW
               -v-                   :

TIPTREE, INC., *et al.*,           :                <u>MEMORANDUM</u>
                               :              <u>OPINION & ORDER</u>
                   Defendants.   :
                               :

-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

      Stefanos Kasselakis achieved success as the chief executive officer of Tiptree Marine LLC

("Tiptree Marine")—a business that he conceived and developed.  Tiptree Marine was a subsidiary

of Tiptree, Inc.  Mr. Kasselakis entered into an agreement with Tiptree, Inc. to serve as Tiptree

Marine's chief executive officer.  Part way through his tenure, Mr. Kasselakis agreed that the

obligations of Tiptree, Inc. under that employment agreement would be assumed by a subsidiary of

Tiptree Marine, Tiptree Marine Florida, LLC ("Tiptree Marine Florida"), which became Mr.

Kasselakis' "Employer" under the employment agreement.

      Despite his success as Tiptree Marine's CEO (or perhaps because of it), Mr. Kasselakis

asserts, Tiptree, Inc.'s executives took steps to freeze him out of the business and did not pay him

the compensation that he was owed under his employment agreement.  Mr. Kasselakis filed this suit

against Tiptree, Inc. and others to enforce his rights under that agreement.  In doing so, Mr.

Kasselakis chose not to join Tiptree Marine Florida as a party to the action, even though that

company had become his "Employer" under the employment agreement.  He presumably chose not

to do so because Tiptree Marine Florida is not diverse, and adding Tiptree Marine Florida to the

action would deprive this Court of subject matter jurisdiction.  Because Tiptree Marine Florida is an

obligor under the contract that Mr. Kasselakis is suing to enforce and because its absence from this case will result in substantial prejudice to it, Tiptree Marine Florida is a necessary and indispensable party to this action.  In its absence, the case must be dismissed.  Defendants' motion to dismiss is GRANTED without prejudice.

## I.     BACKGROUND

### A.     Facts[1]

#### 1.     The Parties (And the Companies That are Not Parties)

The resolution of this motion turns on who the parties are (and who the parties aren't), and where they reside.  The plaintiff, Stefanos Kasselakis, is a resident of Florida.  Complaint ¶ 16.  Mr. Kasselakis was born in Greece and moved to the United States to attend high school.  *Id.* ¶¶ 22–23.  Mr. Kasselakis later attended the University of Pennsylvania, and received a degree from The Wharton School.  *Id.* ¶ 23.  From there, he launched an impressive career—working at Goldman Sachs for several years, before taking over his father's marine paint business in 2014.  *Id.* ¶¶ 24–25.  Mr. Kasselakis restructured his family's business and rebranded the company "Philadelphia Coatings" as an homage to the city where he had lived during college.  *Id.*  Mr. Kasselakis worked with Philadelphia Coatings through 2017 when he began working for one of the subsidiaries of Tiptree, Inc.—the relationship that ultimately led to this lawsuit.

Tiptree, Inc. ("Tiptree Parent") is a publicly traded company organized under the laws of the State of Maryland.  *Id.* ¶ 17.  Tiptree Parent's principal place of business is located in Connecticut.  *Id.*  Tiptree Parent is an insurance holding company.  *Id.* ¶ 27.  The company has a "private capital investments arm."  *Id.*  Tiptree Parent has more than a dozen subsidiaries, including the other

---

[1] Unless otherwise noted, the facts are drawn from the First Amended Complaint (the "Complaint").  Dkt. No. 33.  The facts are accepted as true for purposes of this motion to dismiss.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Tiptree Parent-related entities involved in this dispute. *Id.* ¶ 29. Plaintiff alleges that Tiptree Parent "fully controlled all of its subsidiaries." *Id.* ¶ 30. Tiptree Parent is alleged to have employed Mr. Kasselakis to serve as the CEO of one of its subsidiaries: Tiptree Marine.

Tiptree Asset Management Company, LLC ("TAMCO") is a wholly owned direct subsidiary of Tiptree Parent. *Id.* ¶ 18. The company is organized under the laws of the State of Delaware. The complaint alleges that Tiptree Parent is TAMCO's sole member. As a result, for diversity purposes, TAMCO is considered to be a resident of Connecticut and Maryland, like its corporate member. TAMCO is alleged to have employed Mr. Kasselakis to serve as the CEO of Tiptree Marine. *Id.* And, as will be described in more detail below, TAMCO is the signatory to an employment agreement with Mr. Kasselakis, pursuant to which Mr. Kasselakis agreed to serve as the CEO of Tiptree Marine.

Tiptree Operating Company, LLC ("TOC") is also a wholly owned direct subsidiary of Tiptree Parent. *Id.* ¶ 19. TOC was organized under the laws of the State of Maryland. *Id.* The complaint alleges that Tiptree Parent was TOC's sole member. *Id.* In July 2020, TOC merged with and into Tiptree Parent with Tiptree Parent as the surviving company. *Id.* TOC is alleged to have employed Mr. Kasselakis to serve as the CEO of Tiptree Marine until TOC merged with and into Tiptree Parent. *Id.* ¶ 19.[2] As will be detailed later, TOC was described as Mr. Kasselakis' "Employer" in his employment agreement. But TOC did not sign that agreement; oddly, the agreement was, instead, signed by its then-sister company TAMCO.

Tiptree Marine is a Delaware limited liability company. Tiptree Marine was formed in order to formalize a business relationship between Mr. Kasselakis and Tiptree Parent. *Id.* ¶ 45. The complaint alleges that Tiptree Parent "owned more than 99% of Tiptree Marine" and that Mr.

---

[2] Given that TOC allegedly merged with and into Tiptree Parent, it is unclear why the plaintiff named TOC individually as a defendant.

Kasselakis owned less than 1% of the company.  *Id.* ¶ 47.[3]  The Amended and Restated Limited Liability Company Agreement of Tiptree Marine dated June 1, 2019 identifies the members of Tiptree Marine.  Declaration of William H. Gussman, Dkt. No. 45-1, Ex. A (the "Marine LLC Agreement").  The Marine LLC Agreement identifies five members of Tiptree Marine.  Marine LLC Agreement at Schedule 3.1.  Those are:  (1) Tiptree Holdings LLC, (2) Mr. Kasselakis, (3) Andover LLC—a limited liability company vehicle owned and controlled by Mr. Kasselakis, (4) Philadelphia Coatings, Inc.—Mr. Kasselakis' family company, and (5) George Graham.  Because, at a minimum, Mr. Kasselakis and his limited liability company are citizens of Florida, for diversity purposes Tiptree Marine is a citizen of Florida, like Mr. Kasselakis himself.[4]

The final party that merits an introduction is Tiptree Marine Florida.  Tiptree Marine Florida is a limited liability company whose sole member is Tiptree Marine.  Complaint ¶ 75.  Therefore, for diversity purposes, it, like its sole member, is a citizen of Florida.  Tiptree Marine Florida was created "to process Mr. Kasselakis' payroll when he changed his personal residence from New York to Florida on or about January 1, 2022."  *Id.* ¶ 75.  According to the complaint, the company had no other purpose, or operations.  As will described in more detail below, Tiptree Marine Florida and Mr. Kasselakis entered into an amendment to his employment agreement pursuant to which Tiptree Marine Florida assumed all of the responsibilities of his "Employer" under his agreement to serve as CEO of Tiptree Marine.

---

[3] The complaint alleges "upon information and belief" that Tiptree Marine was "a subsidiary of each of the Tiptree Entities," a term that comprises Tiptree Parent, TAMCO and TOC.  Complaint ¶ 45.  That allegation appears to be inconsistent with the complaint's allegation that TAMCO and TOC were both directly held subsidiaries of Tiptree Parent.  Moreover, the Amended and Restated Limited Liability Company Agreement of Tiptree Marine dated June 1, 2019 states that the majority member of Tiptree Marine is another company, Tiptree Holdings LLC, and that Tiptree Holdings LLC obtained its interests by transfer from TOC.  Marine LLC Agreement at Schedule 3.1.  Exhibit A to that agreement lists TOC as the only party other than Andover LLC that made a capital commitment to Tiptree Marine.  Those facts are inconsistent with the complaint's allegation that Tiptree Marine was a subsidiary of TAMCO.
[4] No party has provided the Court information regarding the citizenship of the other members of Tiptree Marine: Tiptree Holdings, LLC and Mr. Graham.

Although Mr. Kasselakis served as the CEO of Tiptree Marine, and this lawsuit arises from its alleged failure to compensate him for his services under an employment agreement with Tiptree Marine Florida, neither Tiptree Marine nor Tiptree Marine Florida has been named as a party in this action. Because they, like the plaintiff, are both citizens of Florida, had the plaintiff pursued claims against them in this action, this Court would lack subject matter jurisdiction to hear the case.

### 2.   Mr. Kasselakis Develops a Business Plan

In 2016, Mr. Kasselakis was inspired to develop a new business. *Id.* ¶ 26. Mr. Kasselakis saw an opportunity to invest in the maritime bulk shipping market, in which rates were bottoming out at 40-year lows. *Id.* The business plan that he developed—"to acquire dry bulk shipping assets, manage them, and then sell when their market valuations improved"—can be reduced to a simple maxim: buy low and sell high *Id.* Mr. Kasselakis named the business "SwiftBulk." *Id.* ¶ 4. The business would leverage from Mr. Kasselakis' relationships in Greece and the United States and his technical know-how. *Id.* ¶ 26. But Mr. Kasselakis needed capital to get the idea off of the ground. He began to meet with potential investors in November 2016. *Id.* ¶ 34.

Mr. Kasselakis was first introduced to the senior management of Tiptree Parent in December 2016. They must have been impressed, because shortly thereafter, in January 2017, Tiptree Parent sent Mr. Kasselakis a letter of intent to invest in his venture. *Id.* ¶ 36. The company ultimately contributed $35,000,000 in seed funding to the venture; Mr. Kasselakis invested $200,000 in cash through Andover LLC. *Id.* ¶¶ 37–38. Throughout 2017, Mr. Kasselakis "worked without compensation to bring the deal with Tiptree to fruition." *Id.* ¶ 40.

### 3.   The Governing Agreements

#### a.   The Tiptree Marine LLC Agreement

In January 2018, Mr. Kasselakis and the Tiptree entities entered into a number of agreements to formalize their relationship. *Id.* ¶ 45. They formed Tiptree Marine as a company in which to

house the business.  *Id.*  Tiptree Marine was formed in Delaware pursuant to a limited liability company agreement.  The parties did not provide the Court the company's original limited liability company agreement, but the defendants filed the Marine LLC Agreement, which the Court understands to have been in effect when this litigation was commenced.

The Marine LLC Agreement provides that the business of the company will be managed by a three-person board of managers:  two members of the board are appointed by TOC as the "Majority Holder;" Mr. Kasselakis had the right to serve as the third member of the board for as long as he was an employee of the company.  Marine LLC Agreement § 7.1; Complaint ¶¶ 48–49. TOC, as the "Majority Holder," had veto rights over significant transactions involving the company. Marine LLC Agreement § 6.11; Complaint ¶¶ 52–53.

The Marine LLC Agreement divides the company's membership interests into several categories of "units":  "Common Units," "Class A Incentive Units," "Class B-1 Incentive Units," "Class B-2 Incentive Units," "Class B-3 Incentive Units," and "Class C Incentive Units."  Marine LLC Agreement § 3.2(b).  Each category of units has different rights to distributions made by the company.  *Id.* § 5.  The Marine LLC Agreement gives the company's board of managers the authority to issue additional units as the board of managers determines to be appropriate.  *Id.* § 3.5.

While Tiptree Marine operated the marine business developed by Mr. Kasselakis on its own and through a number of subsidiaries, Tiptree Marine relied on Tiptree Parent for back-office support.  "Tiptree [Parent]'s corporate counsel, human resources, treasury, and information technology department performed these functions for Tiptree Marine."  Complaint ¶ 55.

### b.    The Employment Agreement

"Around the time of the [Marine] LLC Agreement," on January 18, 2018, Mr. Kasselakis entered into an employment agreement.  Complaint ¶ 59; Dkt. No. 33-1 ("Employment Agreement").  In its introduction, the Employment Agreement states that the agreement "is entered

into between Tiptree Operating Company, LLC ('Employer'), an Affiliate of Tiptree Marine LLC, a Delaware limited liability company (the 'Company'), and Stefanos Kasselakis (the 'Executive').'' Employment Agreement at 1.  The introduction to the Employment Agreement states that TOC is a party to it.  *See id.*  However, the Employment Agreement was not signed by a representative of TOC.  *See id.* at 10.  Instead, the Employment Agreement was signed by Jonathan Ilany under a signature block for TAMCO.  *Id.*; Complaint ¶ 61 (alleging that the Employment Agreement was "executed by Mr. Kasselakis and Jonathan Ilany as CEO of TAMCO").[5]

The Employment Agreement established TOC as Mr. Kasselakis' "Employer." Employment Agreement at 1.  The agreement provided that Mr. Kasselakis was employed by TOC to provide services to the "Company"—Tiptree Marine—as the Company's Chief Executive Officer.  *Id.* § 3(a).  Section 2 of the Employment Agreement, entitled "Compensation," describes Mr. Kasselakis' compensation.

---

[5] The complaint alleges that at the time that he signed the Employment Agreement in his capacity as CEO of TAMCO, Mr. Ilany "was simultaneously serving as CEO of Tiptree . . . ."  Complaint ¶ 62.  However, the complaint does not allege that Mr. Ilany had any role at TOC.  The effect of the facts that TAMCO signed a document to which it was not identified as a party, and that TOC, which was identified as a party to the Employment Agreement, did not sign the Employment Agreement is an intriguing question, but is not one that the Court has been tasked to answer in this opinion.  The Court assumes that the plaintiff named TAMCO as a defendant in this case because TAMCO signed the Employment Agreement, notwithstanding the fact that the text of the Employment Agreement does not impose any obligations on TAMCO.

> 2.    **Compensation**.
>
> (a)    During the Term, Executive's base salary shall be $175,000 per annum (the "Base Salary"). Such Base Salary shall be payable in such manner as is consistent with Employer's payroll practices for senior executive employees. The Board of Managers of the Company (the "Board") shall annually review Executive's performance considering such factors as the Board deems relevant, and shall consider, in its sole discretion, whether to recommend to Employer an increase in the Base Salary payable hereunder.
>
> (b)    Executive shall participate in and be eligible to receive an annual bonus under the Company's Annual Management Bonus Plan, as in effect from time to time (the "Bonus Plan") with respect to each calendar year during the Term in an amount determined by the Board (the "Bonus"). Executive will not be subject to vesting requirements to receive the annual bonus other than the obligation to remain employed with the Company through the end of the applicable performance year (except as provided in Section 7(d)(A)(ii)).
>
> (c)    In each calendar year commencing in 2018 and continuing through 2022, the Company will award to certain of its executives Class B-1 Units representing 1% of the Company's fully diluted equity at the time of each award, as determined by the Board after consultation with Executive. For each such calendar year, Executive shall be eligible to receive an award of Class B-1 Units on the terms and conditions established by the Board.
>
> (d)    Executive shall be eligible to receive such other incentive compensation during the Term as determined by Employer in consultation with the Board.

Employment Agreement § 2.

As the plaintiff alleges, these terms, "which remained in effect for the duration of Mr. Kasselakis' employment, provided that Mr. Kasselakis would be compensated in four ways."

Complaint ¶ 66.

> *First,* he would receive a base salary with raises at the discretion of the Tiptree [Parent]-controlled Board of Tiptree Marine. *Second,* he would participate in and be eligible to receive an annual bonus pursuant to the Annual Management Bonus Plan (the 'Bonus Plan'). *Third,* for each calendar year from 2018 through 2022, Tiptree Marine 'will award to certain of its executives' . . . Class B-1 units representing 1% of Tiptree Marine's fully diluted equity at the time of each award . . . . *Fourth,* Mr. Kasselakis would be eligible to receive such other incentive compensation as determined by TOC in consultation with the Tiptree [Parent]-controlled Board of Tiptree Marine.

*Id.* ¶¶ 67–70.  Three of those four ways involved some predicate action by the board of managers of Tiptree Marine—the "Company"—or an award of compensation by Tiptree Marine.  As noted above, however, Tiptree Marine is not itself a party to the Employment Agreement, or this action.[6]

### c.     Tiptree Marine's Equity Incentive Plan

The Employment Agreement references compensation to be awarded to Mr. Kasselakis pursuant to Tiptree Marine's equity incentive plan.  The defendants provided the Court with a copy of the Amended and Restated 2018 Equity Incentive Plan, effective June 1, 2019, which the Court understands to be the version of the plan in effect at the time that this lawsuit was commenced. Dkt. No. 45-3 (the "Equity Incentive Plan").  The Equity Incentive Plan establishes that an "Administrator"—Tiptree Marine's board of managers—"will administer the Plan and will have discretionary authority, subject only to the express provisions of the Plan, to administer and interpret the Plan and any Award Agreement; to determine eligibility for and grant Awards . . . ." Equity Incentive Plan § 3.  The board's discretion to grant awards is subject to the proviso that it must grant a specified amount of Class B-1 Incentive Units, determined by the board based on the size of the company's bonus pool.  *Id.*  Subject to that limitation, the Equity Incentive Plan provides for the issuance of annual awards of incentive units of the company's equity at the board's discretion.

---

[6]  Section 7 of the Employment Agreement contains a description of payments due to Mr. Kasselakis in the event that his employment terminated prior to the end of the term of the Employment Agreement.  That section of the agreement is worthy of note, because, unlike Section 2, it includes clear mandatory language requiring the Employer to make payments or to cause Tiptree Marine to take certain acts.  *Compare* Section 7(d)(A) ("Employer shall:  (i) pay Executive severance in an amount equal to one hundred percent (100%) of Executive's Base Salary . . . ; (ii) cause to be paid to Executive a bonus under the Bonus Plan . . . .") *with* Section 2(a) ("Executive's base salary shall be $175,000 per annum . . . ."); Section 2(b) ("Executive shall participate in and be eligible to receive an annual bonus . . . ."); and Section 2(c) ("[T]he Company will award to certain of its executives Class B-1 Units . . . .").  The parties did not address the lack of similarly clear mandatory language in Section 2 of the Executive Agreement in their briefing, presumably assuming that Section 2 imposes an obligation on Tiptree Parent to require Tiptree Marine to make the payments described in Section 2 of the Employment Agreement.  For purposes of this opinion, the Court assumes, without holding, that it does. However, the difference in the language used in Sections 2 and 7 of the Employment Agreement is worthy of note and may suggest an intentional difference in the scope of the Employer's obligations to compensate Mr. Kasselakis prior to an early termination.

The Equity Incentive Plan is governed by Delaware law.  The plan contains a provision mandating that actions brought "with respect to the Plan or an Award Agreement will be brought in the federal or state courts of the State of Delaware, and, by accepting an Award, each Participant agrees to submit to the personal jurisdiction and venue thereof."  *Id.* § 19.  The Equity Incentive Plan contains an integration provision, which states that the Equity Incentive Plan and "any applicable Award Agreements and the LLC Agreement constitute the entire agreement with respect to the subject matter hereof and thereof."  *Id.* § 21.  None of the defendants in this action is a party to the Equity Incentive Plan, which relates to the issuance of equity units in Tiptree Marine, under the direction of that company's board of managers.

### d.    Tiptree Marine's 2019 Cash Bonus Plan

Mr. Kasselakis complains that the defendants in this case breached the Employment Agreement because Tiptree Marine did not issue pay him a cash bonus as outlined in Tiptree Marine's 2019 Annual Management Bonus Plan.  Dkt. No. 33-3 (the "2019 Bonus Plan"); *see, e.g.*, Complaint ¶¶ 109, 189.  Tiptree Marine's 2019 Bonus Plain "remained in effect from January 18, 2018 through the end of Mr. Kasselakis['] employment on March 13, 2023."  Complaint ¶ 110.  The 2019 Bonus Plan describes its purpose as being "to advance the interests of the Company and its Subsidiaries by providing for the grant of Participants of cash-based incentive awards . . . ."  2019 Bonus Plan § 2.

The 2019 Bonus Plan grants the board of Tiptree Marine the "discretionary authority, subject only to the express provisions of the Plan and the Award Agreements, to interpret the plan; determine the Company's pre-tax income for a given Plan year; determine eligibility for and grant Awards; . . . and otherwise do all things necessary to carry out the purposes of the Plan."  *Id.* § 3.  "All determinations of the Administrator made with respect to the Plan or its operation are conclusive and bind all Persons."  *Id.*

Section 5 of the 2019 Bonus Plan establishes the Tiptree Marine's default bonus pool under the 2019 Bonus Plan.

> 5.     <u>Annual Amounts under the Plan</u>.  The total size of the annual bonus pool under the Plan, expressed as a percentage of the Company's pre-tax income (subject to adjustment as agreed by the Administrator and the Company's Chief Executive Officer) for such Plan year (the "Bonus Pool"), shall be as follows, unless otherwise determined by the Administrator:
>
> | Plan Year | Bonus Pool (as a % of Company Pre-Tax Income) |
> |-----------|-----------------------------------------------|
> | 2019 | 10% |
> | 2020 | 9% |
> | 2021 | 8% |
> | 2022 | 7% |
> | 2023 | 6% |
> | 2024 (and thereafter) | 5% |

2019 Bonus Plan § 5.  The 2019 Bonus Plan provides the Tiptree Marine board of managers the authority to "determine the terms of all Awards," and that it "shall furnish to each Participant an Award Agreement setting forth the terms applicable to the Participant's Award."  *Id.* § 6(a).  Awards under the plan "vest on the terms and conditions set forth in such Participant's Award Agreement . . . ."  *Id.* § 7.

Like the Equity Incentive Plan, the 2019 Bonus Plan is governed by Delaware law.  *Id.* § 14.  And awardees are required to waive their rights to a jury trial as a condition to any bonus award.  *Id.* § 13(a).  The 2019 Bonus Plan also contains an integration clause, which establishes that the "Plan and the Award Agreements constitute the entire agreement with respect to the subject matter hereof and thereof . . . ."  *Id.* § 15.  In his complaint, Mr. Kasselakis alleges that the defendants in this action "owe Mr. Kasselakis portions of his cash bonus for 2021 and 2022," Complaint ¶ 112, but it is noteworthy that none of the defendants is a party to the 2019 Bonus Plan, that its integration clause

disclaims outside agreements with respect to its terms, and that all decisions made pursuant to it are entrusted to Tiptree Marine's board of managers.

### e.       The Amendment to the Employment Agreement

On April 1, 2022, the parties to the Employment Agreement entered into an amendment to the agreement.  Dkt. No. 33-2 (the "Amendment").  According to the Amendment, the parties entered into it because "the Parties desire to amend the Employment Agreement to change the employer of Kasselakis to Tiptree Marine Florida, LLC, a Florida limited liability company with a principal place of business located in the State of Florida . . . ."  Amendment at 1.

There were three parties to the Amendment, Tiptree Parent—at that point the successor by merger to TOC—Mr. Kasselakis, and Tiptree Marine Florida.  *Id.* at 2.  The Amendment modified the Employment Agreement so that Tiptree Marine Florida would be treated for all purposes as Mr. Kasselakis' "Employer" under the Employment Agreement.  The Amendment expressly substituted Tiptree Marine Florida for Tiptree Parent as the "Employer" under the contract."  *Id.* § 1(a) ("The first paragraph of the Employment Agreement is hereby amended so that the defined term of 'Employer' shall hereafter refer in all cases to Tiptree Marine Florida, LLC.").  Furthermore, the Amendment provides the following:

> From and after the date hereof, all references to the Employment Agreement shall refer to the Employment Agreement shall refer to the Employment Agreement, as amended by this Amendment.  If any provision of this Amendment conflicts with the Employment Agreement, the provisions of this Amendment shall control.

*Id.* § 2.

Mr. Kasselakis alleges that Tiptree Marine Florida was "a newly formed subsidiary created to process Mr. Kasselakis' payroll when he changed his personal residence from New York to Florida on or about January 1, 2022."  Complaint ¶ 75.  Tiptree Marine Florida was a wholly owned subsidiary of Tiptree Marine, which was Tiptree Marine Florida's only member.  *Id.* ¶ 82.  The complaint alleges that Tiptree Marine Florida conducted "no business other than processing Mr.

Kasselakis' payroll," and that the company did not have a board of managers or hold board meetings.  *Id.* ¶¶ 78, 81.

### 4.  Tiptree Marine's Success

Mr. Kasselakis alleges that the Tiptree Marine business headed by him "created extraordinary returns" for the defendants in this case.  *Id.* ¶ 86.  Starting in 2018, he "executed his vision of acquiring dry bulk shipping assets at depressed values . . . ."  *Id.* ¶ 87.  He acquired and managed dry bulk vessels and later diversified the company's business beyond dry bulk shipping by acquiring refined oil tankers.  *Id.* ¶¶ 87–89.  Mr. Kasselakis managed the company through challenges— including the COVID-19 pandemic—all the while improving the company's efficiency.  *Id.* ¶¶ 89– 91.

By 2021, rates in the dry bulk shipping business had improved, just as Mr. Kasselakis had anticipated.  *Id.* ¶ 92.  And in 2022, Mr. Kasselakis arranged for the sale of several of the vessels that Tiptree Marine had acquired.  His timing was good—the pricing that he achieved "far exceeded Tiptree's expectations and . . . marked industry highs."  *Id.* ¶ 93.  Mr. Kasselakis alleges that all of the feedback that he received during his years at the helm of the Tiptree Marine business was positive— Tiptree Parent executives old him that he was a "true leader" who did a "masterful job."  *Id.* ¶ 94. The businesses' positive returns spoke for themselves, and after modest early losses as the business ramped up, Tiptree Marine contributed substantially to Tiptree Parent's bottom line:  pretax net income of $11.6 million in 2021 and $49.8 million in 2022.  *Id.* ¶ 97.

### 5.  A Dispute Arises

Of course, the good times did not continue to roll, or this action would not have been brought.  According to Mr. Kasselakis:  "Once it became clear to the Tiptree Entities that Mr. Kasselakis would be entitled to significant earnings pursuant to the terms of his Employment Agreement and other agreements with Tiptree on account of his extraordinary successes leading

Tiptree Marin as the sole executive across its multiple maritime businesses, the Tiptree Entitles devised a strategy to claim Mr. Kasselakis' share of the upside that he had created and bargained for." *Id.* ¶ 100. They did this by slow walking his compensation and then withholding it entirely. *Id.* Finally, when Mr. Kasselakis declined to give up his claims to the unpaid compensation, he was terminated. *Id.* ¶ 2.

Mr. Kasselakis asserts that the defendants withheld compensation that was due to him in several ways. First, he asserts that they violated Section 2(a) of the Employment Agreement. He alleges that there was an agreement by the defendants to "raise Mr. Kasselakis' base salary for 2023 to $390,00 from $350,000 pursuant to Paragraph 2(a) of the Employment Agreement." *Id.* ¶ 102. According to the complaint, this "agreement was documented in, among other places, the minutes of a Tiptree Marine Board meeting." *Id.* ¶ 103.[7] Mr. Kasselakis alleges that from January 1, 2023 through March 13, 2023, he "was paid at the 2022 rate and not the 2023 rate." *Id.* ¶ 104.

Second, Mr. Kasselakis asserts that the defendants violated Section 2(b) of the Employment Agreement by failing to pay him a cash bonus due to him under the 2019 Bonus Plan with respect to the 2021 and 2022 plan years. Mr. Kasselakis alleges that he was "entitled to a cash bonus of approximately $900,000" for 2021, which represented 8% of Tiptree Marine's pretax income for the year. *Id.* ¶ 113. But "Mr. Kasselakis and Tiptree [Parent] reached an agreement to adjust Tiptree Marine's pretax net income for the purpose of his bonus calculation until the [litigation] resolved, at which point the Tiptree Entities would pay the balance on a potential favorable award." *Id.* ¶ 114. The litigation resolved favorably in 2023, but Tiptree Parent refused to pay the remainder of Mr. Kasselakis' 2021 bonus. *Id.* ¶¶ 115–17.

---

[7] The complaint does little to explain how the defendants were contractually bound by minutes reflecting a decision by Tiptree Marine's board of managers.

Mr. Kasselakis asserts that his 2022 cash bonus was also underpaid.  He alleges that he was owed "approximately $3.6 million, representing 7% of Tiptree Marine's pretax income for that year."  *Id.* ¶ 118.  In March 2023, Mr. Kasselakis was paid approximately $2.5 million for his 2022 cash bonus.  *Id.* ¶ 119.  But the "Tiptree Entities created a pretextual reason to withhold approximately $1.1 million from Mr. Kasselakis' 2022 cash bonus"—yet another "reserve" for potential litigation that was used to offset the company's pretax income.  *Id.* ¶ 120.  Mr. Kasselakis demanded that the company pay him the balance of his bonus; in response, Tiptree [Parent] wrote that it "hope[d]" that the amount withheld would be paid once the need for the litigation reserve had ended.  *Id.* ¶ 125.  Mr. Kasselakis alleges that the need did end in the Spring of 2023, when the company prevailed in the litigation.  *Id.* ¶¶ 126–29.  Mr. Kasselakis still was not paid; the defendants took the position that he was not entitled to the additional bonus payment.  *Id.* ¶ 129.

Third, Mr. Kasselakis alleges that the defendants failed to cause Tiptree Marine to issue him B-1 Units, which he asserts to be required by Section 2(c) of the Employment Agreement. Remember that Section 2(c) of the Employment Agreement states the following:

> In each calendar year commencing in 2018 and continuing through 2022, the Company will award to certain of its executives Class B-1 Units representing 1% of the Company's fully diluted equity at the time of each award, as determined by the Board after consultation with Executive.  For each such calendar year, Executive shall be eligible to receive an award of Class B-1 Units on the terms and conditions established by the Board.

Employment Agreement § 2(c).  Mr. Kasselakis takes the position that this provision of the Employment Agreement mandates the issuance of B-1 Units by Tiptree Marine representing 1% of its diluted equity annually, and that because Mr. Kasselakis was the only executive of the company during the period in question, he is entitled to the full 1% for each year that he served as Tiptree Marine's CEO.  *Id.* ¶¶ 131–38.

"Beginning in late 2018, Mr. Kasselakis repeatedly raised the Tiptree Entities' failure to direct an award of these missing shares with Tiptree [Parent's] Senior Officers . . . ."  *Id.* ¶ 144.  In

2019, Mr. Kasselakis threatened to resign if he was not issued the equity. "It was only then that the Tiptree Entities committed to awarding 2% of the B-1 units owed to him, which it did several months later, on or about February 2020." *Id.* ¶ 146. But Mr. Kasselakis contends that he is entitled to an additional 3% of B-1 units—representing the allocation for calendar years 2020, 2021 and 2022. *Id.* ¶ 148.

Fourth, Mr. Kasselakis asserts that the defendants breached Section 2(d) of the Employment Agreement by failing to issue him "Class A" shares in Tiptree Marine. Section 2(d) of the Employment Agreement says that Mr. Kasselakis "shall be eligible" to "receive such other incentive compensation during the Term as determined by Employer in consultation with the Board." Employment Agreement § 2(d). Mr. Kasselakis asserts that the agreement's statement describing him as "eligible" to receive such payments gives rise to a contractual obligation to pay him such amounts.

Mr. Kasselakis contends that this section of the Employment Agreement was breached as a result of Tiptree Marine's failure to issue him Class A shares in Tiptree Marine. The specific agreement to issue Mr. Kasselakis those shares is not alleged to have been documented in a formal written agreement. Mr. Kasselakis alleges that in March 2017, "Tiptree [Parent] and Mr. Kasselakis agreed to create a class of equity in Tiptree Marine known as the Class A shares, which were intended as 'sweat equity' for Mr. Kasselakis and any other employees whom the Tiptree Entities sought to reward . . . for their work on Tiptree Marine." Complaint ¶ 152. Mr. Kasselakis alleges that the shares were intended to be awarded at the inception of Tiptree Marine in January 2018, but they were not. *Id.* ¶ 154. Instead, in December 2018, "almost one year post closing, Mr. Kasselakis, the Tiptree Entities, and Tiptree Marine's Tiptree [Parent]-controlled Board promised Mr. Kasselakis over phone and email that Tiptree [Parent] and Tiptree Marine would grant Mr. Kasselakis 100% of the Class A shares . . . ." *Id.* ¶ 155. Mr. Kasselakis alleges that what he

acknowledges to be this "separate" agreement "was consistent with the express terms of the Employment Agreement." *Id.* ¶ 157.

Mr. Kasselakis did not receive any Class A shares until July 2019, and then he only received 25% of the shares, rather than the 100% he asserts that he was promised. *Id.* ¶¶ 158–59. The CEO of Tiptree Parent told Mr. Kasselakis that more Class A shares would come, but despite much advocacy by Mr. Kasselakis, they never did. *Id.* ¶¶ 160–61. Tiptree Marine had a liquidity event on November 19, 2022, "when it sold its fifth vessel, and with it, substantially all of its assets. At that point, the Class A shares vested." *Id.* ¶ 165. Because those Class A shares had not been issued to Mr. Kasselakis, Tiptree Parent's equity stake was not further diluted. Mr. Kasselakis assets that he is "owed approximately $4,000,000 for the remaining Class A shares that were promised but never granted to him ahead of the liquidity event that caused them to vest." *Id.* ¶ 168.

### 6.   Mr. Kasselakis Is Terminated

In the summer of 2022, "as the Tiptree Entities had met Mr. Kasselakis' complaints about withheld compensation with bland assurances and total inaction," officers of Tiptree Parent proposed starting a new venture with Mr. Kasselakis. *Id.* ¶ 169. While discussions about the venture took place, the defendants sidelined Mr. Kasselakis by refusing to give him advance notice of cash distributions to Tiptree Marine equity holders in September 2022 and January 2023. *Id.* ¶¶ 176–77. Those distributions were substantial—Mr. Kasselakis alleges that Tiptree Marine made cash distributions totaling approximately $85.7 million. *Id.* ¶ 175.

In December 2022, and January 2023, Mr. Kasselakis made "formal demands" for the missing equity units in Tiptree Marine and the cash bonuses to which he believed he was entitled. *Id.* ¶ 180. The defendants did not pay him. Instead, they required that Mr. Kasselakis waive his claims to the missing compensation as a condition to proceeding with a new venture. *Id.* ¶ 181. Mr.

Kasselakis refused.  *Id.* ¶ 183.  Just six days later, Mr. Kasselakis was terminated "without Cause." *Id.* ¶ 185.

### B.  Procedural History

The plaintiff filed his initial complaint in this action on April 3, 2023.  Dkt. No. 1.  On June 2, 2023, the defendants filed a letter requesting a pre-motion conference to discuss an anticipated motion to dismiss the complaint.  Dkt. No. 24.  Among the arguments anticipated in that motion was a contention that the Court lacked subject matter jurisdiction over the case because Tiptree Marine and Tiptree Marine Florida were necessary and indispensable parties, whose joinder would deprive the Court of diversity subject matter jurisdiction.  Following a conference with the Court, the parties agreed to allow the plaintiff to file an amended complaint.  The amended complaint— which is the operative complaint in this action—was filed on June 26, 2023.  Dkt. No. 33.

The defendants filed a motion to dismiss the Complaint on September 6, 2023.  Dkt. No. 43 (motion); Dkt. No. 44 (memorandum of law or "D. Mem.").  In support of the motion, the defendants filed a declaration by William H. Gussman, attaching the Marine LLC Agreement, the Equity Incentive Plan and the 2019 Bonus Plan.  The defendants presented a number of arguments in support of their motion to dismiss.  They contended, among other things, that the complaint does not state a cause of action for breach of contract because Section 2 of the Employment Agreement does not mandate that the defendants pay what the plaintiff claims to be due.  D. Mem. at 13–16.

But most significantly for purposes of this opinion, the defendants argued that this Court lacks subject matter jurisdiction over the case.  That is because, the defendants argued, Tiptree Marine and Tiptree Marine Florida are necessary parties to this dispute.  *Id.* at 7–12.  The defendants' argument began with the undisputed assertion that Tiptree Marine and Tiptree Marine Florida are citizens of Florida for purposes of evaluating whether diversity jurisdiction exists.  *Id.* at 7.  The defendants argued that Tiptree Marine is a necessary party because, among other things, the

alleged misconduct was undertaken by Tiptree Marine, and because Tiptree Marine is required to provide Mr. Kasselakis the relief that he requests—the issuance of shares of its equity. *Id.* at 7–8. Tiptree Marine Florida is necessary, the defendants argued, because that company became Mr. Kasselakis' "Employer" as a result of the Amendment.

The defendants argued that Tiptree Marine and Tiptree Marine Florida were, moreover, indispensable parties. As to Tiptree Marine Florida, that is because, they argued, it was responsible for any contractual obligations under the Employment Agreement at least from and after the date of the Amendment. *Id.* at 11. The defendants argued that the plaintiff's "contention that Tiptree Marine Florida had not rights or responsibilities under the Employment Agreement is contradicted by its plain terms." *Id.* Tiptree Marine itself was indispensable, the defendants argued, because its conduct was at the core of the case—and because issues related to the issuance of its equity were expressly left to its discretion in its incentive plans. *Id.*

The plaintiff filed his opposition to the motion to dismiss on October 11, 2023. Dkt. No. 50 (memorandum of law or "Opp."). The plaintiff acknowledged that the inclusion of either Tiptree Marine or Tiptree Marine Florida in this action would defeat complete diversity of the parties. *Id.* at 5–6. In his opposition, the plaintiff pointed to the practical ability of the defendants (really TOC and, later, Tiptree Parent) to control actions by Tiptree Marine through "powers conferred to them under the [Marine] LLC Agreement." *Id.* at 7. "The plain terms of the [E]mployment Agreement and [Marine] LLC Agreement notwithstanding, Tiptree [Parent] and the other Defendants also retained *de facto* control over Tiptree Marine's decisions." *Id.* Thus, the plaintiff argued, Tiptree Marine is not a necessary party because its parent company is a party to the action. The plaintiff argued that Tiptree Marine is not indispensable for much the same reason: he contends that they share the "same position and counsel" when it comes to their dispute with Mr. Kasselakis. As a

result, the plaintiff argued, Tiptree Marine is not prejudiced by the fact that it is not a party to this action.

The plaintiff argued that Tiptree Marine Florida is neither necessary nor indispensable, "despite being a signatory to the Amendment," because it "is effectively a shell company," and thus lacks an interest in the litigation different than that of its corporate parent. *Id.* at 9–10. The motion was fully briefed when the defendants filed their reply. Dkt. No. 55. The Court held oral argument with respect to the motion on May 30, 2024.

## II.   LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 12(b)(7):  Motion to Dismiss for Failure to Join a Party Under Federal Rule of Civil Procedure 19

"Rule 19 recognizes exceptional circumstances in which the plaintiff's choice of parties or forum must give way because of an absent party's interest in the outcome of the action or involvement in the underlying dispute." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 131–33 (2d Cir. 2013). "Fed. R. Civ. P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party." *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000). "First, the court must determine whether an absent party belongs in the suit, *i.e.*, whether the party qualifies as a 'necessary' party under Rule 19(a)." *Id.* "If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b)." *Id.* "But where the court makes a threshold determination that a party is necessary under Rule 19(a), and joinder of the absent party is not feasible for jurisdictional or other reasons, the court must finally determine whether the party is 'indispensable.'" *Id.* (internal quotation marks and citations omitted). "If the court determines that a party is indispensable, then the court must dismiss the action pursuant to Rule 19(b)." *Id.*

### 1.  Federal Rule of Civil Procedure 19(a):  "Necessary" Parties

"Rule 19(a) sets out two situations in which joinder of a party is compulsory."  *Peregrine*

*Myanmar Ltd. v. Segal*, 89 F.3d 41, 47–49 (2d Cir. 1996).  Rule 19(a) provides in relevant part the

following:

> A person who is subject to service of process and whose joinder will not
> deprive the court of subject-matter jurisdiction must be joined as a party if:
>    (A) in that person's absence, the court cannot accord complete relief among
>        existing parties; or
>    (B) that person claims an interest relating to the subject of the action and is
> so situated that disposing of the action in the person's absence may:
>            (i) as a practical matter impair or impede the person's ability to
>        protect the interest; or
>            (ii) leave an existing party subject to a substantial risk of incurring
>        double, multiple, or otherwise inconsistent obligations because of the
>        interest.

Fed. R. Civ. P. 19(a)(1).  "Subsection (a) protects certain parties by deeming them 'required'; a party

who is 'required' according to the factors enumerated in subsection (a) is one whose participation is

so desirable or important that the party must be joined so long as she or he is 'subject to service of

process' and joinder 'will not deprive the court of subject-matter jurisdiction.'"  *Marvel Characters,*

*Inc.*, 726 F.3d at 131 (quoting Fed. R. Civ. P. 19(a)(1)).

In cases involving contractual disputes, determining whether a party is "necessary" turns in

part on whether the absent party has rights under the contract.  "If the resolution of a plaintiff's

claim would require the definition of a non-party's rights under a contract, it is likely that the non-

party is necessary under Rule 19(a)."  *Jonesfilm v. Lion Gate Int'l*, 299 F.3d 134, 141 (2d Cir. 2002); *see*

*also Peregrine Myanmar Ltd.*, 89 F.3d at 48 ("The key issue in deciding whether either part of Rule 19(a)

applies is the extent to which this case requires a determination of rights and interests under [the

contract to which the absent entity is a party].");  *Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 701

(2d Cir. 1980) ("Since there is no question that the Exchange Agreement is a contract that was

within the powers of the corporation, and since Belden's rights thereunder would clearly be

prejudiced if the relief sought by InterNorth were to be granted, Belden's presence is required."). By contrast, a "nonparty to a commercial contract ordinarily is not a necessary party to an adjudication of rights under the contract." *ConnTech Dev. Co. v. Univ. of Connecticut Educ. Properties, Inc.*, 102 F.3d 677, 681–82 (2d Cir. 1996) (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1044 (9th Cir. 1983)).

Similarly, whether a non-party has an interest in the ownership of property that is disputed in the litigation has a bearing on whether that party is "necessary." *See, e.g.*, *Brody v. Village of Port Chester*, 345 F.3d 103, 117–19 (2d Cir. 2003) (holding that in action by property owner to recover land taken by eminent domain, current titleholder to land might be necessary party if district court were to restore land to plaintiff); *Kulawy v. United States*, 917 F.2d 729, 736 (2d Cir. 1990) (holding that in an action to quiet title by aggrieved taxpayer against government seeking to recover automobiles sold to satisfy tax lien, purchasers of automobiles were necessary parties). In a case in which the trial court is asked to determine who owns a piece of property, "in the absence of the current or competing titleholders to a piece of property," a trial court may not be able to grant the requested relief—determining who owns the disputed property. *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 387 (2d Cir. 2006).

The absent party must "claim an interest" in the subject matter of the litigation. *Peregrine Myanmar Ltd.*, 89 F.3d at 49. A third party may not claim it on the absent party's behalf. *Id.* Moreover,

> [i]t is not enough under Rule 19(a)(2)(i) for a third party to have an interest, even a very strong interest, in the litigation. Nor is it enough for a third party to be adversely affected by the outcome of the litigation. Rather, necessary parties under Rule 19(a)(2)(i) are only those parties whose ability to protect their interests would be impaired ***because of*** that party's absence from the litigation.

*Id.* (emphasis in original).

Rule 19(a) tasks the trial court to determine whether it can afford "complete relief" between the parties in the absence of the absent party.  "Complete relief" can be accorded without an absent party when, among other things "nothing in the district court's statements or final judgment requires the [absent party] to do anything or change any of its positions." *Id.* at 48.  By contrast, if the absent party must be required to do something to afford a party complete relief—such as through injunctive relief applicable to it must be subjected to an injunction in order to afford complete relief, that absent party is likely to be a necessary party. *See, e.g.*, *Associated Dry Goods Corp. v. Towers Fin. Corp.*, 920 F.2d 1121, 1124 (2d Cir. 1990) ("417 Fifth may be considered a party to be joined if feasible under Rule 19(a), since without 417 Fifth, Towers would not be able to obtain full injunctive relief on any counterclaim it asserts against Associated to increase electrical capacity.  For example, if 417 Fifth is not made a party, the court could not compel Associated to increase the amperage supplied to the seventh and eighth floors, for Associated cannot allocate this electricity without 417 Fifth's consent.").

### 2.  Federal Rule of Civil Procedure 19(b):  "Indispensable" Parties

"[W]here the court makes a threshold determination that a party is necessary under Rule 19(a), and joinder of the absent party is not feasible for jurisdictional or other reasons, the court must finally determine whether the party is 'indispensable.'" *Viacom Int'l*, 212 F.3d at 725.  "If the court determines that a party is indispensable, then the court must dismiss the action pursuant to Rule 19(b)." *Id.*

Federal Rule of Civil Procedure 19(b) outlines the process by which a trial court determines whether an absent necessary party is "indispensable."

> If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed.  The factors for the court to consider include:

> (1) the extent to which a judgment rendered in the persons absence might prejudice that person or the existing parties;
>
> > (2) the extent to which any prejudice could be lessened or avoided by:
> >
> > > (A) protective provisions in the judgment;
> > >
> > > (B) shaping the relief; or
> > >
> > > (C) other measures;
> >
> > (3) whether a judgment rendered in the person's absence would be adequate; and
> >
> > (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b). The Second Circuit modestly restated the four considerations set forth in Rule 19(b) to determine whether a party is "indispensable" as: "(1) whether a judgment rendered in a person's absence might prejudice that person or parties to the action, (2) the extent to which any prejudice could be alleviated, (3) whether a judgment in the person's absence would be adequate, and (4) whether the plaintiff would have an adequate remedy if the court dismissed the suit." *Marvel Characters, Inc.*, 726 F.3d at 133 (quoting *CP Sols. PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156, 159 (2d Cir. 2009)).

A district court should take a "flexible approach" to a Rule 19(b) analysis. *See, e.g.*, *Marvel Characters, Inc.*, 726 F.3d at 132; *Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir. 1987) (noting that "a court should take a flexible approach when deciding what parties need to be present for a just resolution of the suit."). The four factors identified in Rule 19(b) are not exclusive; they are considerations that "will ordinarily be among those relevant to the analysis of whether a party is 'indispensable.'" *Marvel Characters, Inc.*, 726 F.3d at 133. Nor does Rule 19(b) "assign relative weight to each of the factors enumerated in this Rule." *Associated Dry Goods Corp.*, 920 F.2d at 1124. Instead, the rule contemplates that a district court will "determine the emphasis to be placed on each consideration according to 'the facts of [the] given case and in light of the governing equity-and-good-conscience test.'" *Id.* "The language of Rule 19(b) leaves the district court with 'substantial discretion in considering which factors to weigh and how heavily to emphasize certain considerations in deciding whether the action should go forward in the absence of someone needed

for a complete adjudication of the dispute.'" *Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70, 75 (2d Cir. 1984). "Applying the[] factors requires an understanding of the legal interests at stake . . . ." *Marvel Characters, Inc.*, 726 F.3d at 133.

"'Federal courts are extremely reluctant to grant motions to dismiss based on nonjoinder and, in general, dismissal will be ordered only when the defect cannot be cured and serious prejudice or inefficiency will result.'" *Am. Trucking Ass'n, Inc. v. New York State Thruway Auth.*, 795 F.3d 351, 357 (2d Cir. 2015) (quoting 7 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRACTICE & PROCEDURE § 1609 (3d ed. 2015)). "Rule 19 is about protecting absent persons from unfair prejudice—it is not about giving a named defendant veto power over the plaintiff's chosen forum." *Id.* at 360. "'[V]ery few cases should be terminated due to the absence of nondiverse parties unless there has been a reasoned determination that their nonjoinder makes just resolution of the action impossible.'" *Universal Reins. Co. Ltd. v. St. Paul Fire and Marine Ins. Co.*, 312 F.3d 82, 87 (2d Cir. 2002) (quoting *Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir. 1987)).

"Defendants, as the moving party, bear the burden of establishing that joinder of necessary parties is required." *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 311 (E.D.N.Y. 2008) (collecting cases); *Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 495 (S.D.N.Y. 2002) (same). Here, in addition to the documents attached to the Complaint, the Court has considered the 2019 Bonus Plan, the Equity Incentive Plan and the Marine LLC Agreement, all of which were attached to the Declaration of William H. Gussman, Dkt. No. 45. "The Court may consider matters outside the pleadings in ruling on" a Rule 19 motion. *Holland*, 210 F.R.D. at 495. All of the documents attached to the declaration of Mr. Gussman also qualify as integral to the complaint. The complaint relies heavily on the terms and effects of each. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). And there is no dispute regarding their authenticity or accuracy. *Id.*

III.     DISCUSSION

A.     Tiptree Marine Florida is a Necessary Party

Tiptree Marine Florida is a necessary party.  By virtue of the Amendment, Tiptree Marine Florida became Mr. Kasselakis' "Employer" for all purposes under the Employment Agreement. The Amendment became effective on April 1, 2022.  As described in detail above, Mr. Kasselakis asserts claims for breach of the Employment Agreement with respect to claims that accrued after the date of the Amendment.  This litigation will require the adjudication of the scope of Tiptree Marine Florida's rights and obligations under the Employment Agreement.  As a result, Tiptree Marine Florida is a necessary party.

Mr. Kasselakis cannot, through his pleadings, neutralize the clear text of the Amendment.  In his Complaint, Mr. Kasselakis alleges that "Tiptree Marine Florida had no rights or responsibilities under the Employment Agreement or Amendment."  Complaint ¶ 77.  The Court disregards that allegation because it is a legal conclusion.  *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More significantly, the assertion is not legally correct.  The express text of the Amendment provides that Tiptree Marine Florida has the same rights and obligations under the Employment Agreement as Tiptree Parent and TOC at least from and after the date of execution of the Amendment.  Mr. Kasselakis cannot change the clear legal significance of the Amendment by pleading it away.

Nor does the fact that Tiptree Marine Florida is alleged to be a shell company change the legal effect of the Amendment, as Mr. Kasselakis seems to suggest in his complaint.  Mr. Kasselakis agreed that the obligations of Tiptree Parent and TOC under the Employment Agreement would be assumed by Tiptree Marine Florida.  It may not have been wise for him to agree that what he alleges to be a shell company take over any obligations to him from its publicly traded parent.  But that is of no consequence, for the text of the Amendment is clear—at least "from and after" the date of the Amendment, Tiptree Marine Florida had the obligations of Mr. Kasselakis' "Employer" under the

Agreement—including any obligations under Section 2 of the agreement.  Tiptree Marine Florida rightly claims an interest in the subject matter of this action:  if there is a claim for a breach of the Employment Agreement with respect to events that occurred after April 2022, the claim lies against Tiptree Marine Florida.

Resolution of the plaintiff's claims in the absence of Tiptree Marine Florida will impair its ability to protect its interest and leave Tiptree Parent subject to a substantial risk of inconsistent obligations.  First, the Court highlights that while Tiptree Marine Florida is a subsidiary of Tiptree Parent, it is not a wholly owned subsidiary:  several others, including Mr. Kasselakis, own some equity in Tiptree Marine Florida's parent company, Tiptree Marine.  *See, e.g.*, Complaint ¶ 47.  The interests of Tiptree Parent and TOC differ from those of Tiptree Marine Florida with respect to the effect of the Amendment in several ways.

Most significantly, in litigating the plaintiff's claims in this case, a court will need to determine the extent to which the Amendment transferred any obligations that Tiptree Parent and TOC may have had prior to the Amendment to Tiptree Marine Florida.  Tiptree Parent has every incentive to take the position (as it has) that the Employment Agreement devolved its obligations to Tiptree Marine Florida:  Tiptree Parent, is, after all, as the plaintiff alleges, a well-resourced public company; Tiptree Marine Florida, by contrast, is alleged to have few assets.  Tiptree Marine is also alleged to have at least one unbeloved additional shareholder—Mr. Kasselakis—the value of whose equity position in Tiptree Marine would presumably be reduced if its subsidiary, Tiptree Marine Florida, was found to be liable for the plaintiff's claims.  An argument that any liability to Mr. Kasselakis resides in an asset-poor, indirect subsidiary benefits Tiptree Parent.  Tiptree Parent can be

expected to press the argument that its obligations under the Employment Agreement passed to Tiptree Marine Florida as a result of the Amendment.[8]

Tiptree Marine Florida, on the other hand, has an interest in reducing the scope of its potential liability for any claims by Mr. Kasselakis. That may require it to argue that Tiptree Parent retains obligations under the Employment Agreement following the date of the Amendment. In sum, without representation in this litigation, Tiptree Marine Florida's interest in the litigation may be impaired.

The Court also cannot afford complete relief with respect to Mr. Kasselakis' claims in the absence of Tiptree Marine Florida. That is for the simple reason that he is pursuing breach of contract claims under the Employment Agreement with respect to events that occurred after Tiptree Marine Florida became his "Employer" in April 2022. The Court cannot order Tiptree Parent to make good on any obligations owed by its subsidiary under the Employment Agreement. Tiptree Marine Florida is a necessary party because Mr. Kasselakis' claims for breach of the Employment Agreement following the Amendment are properly directed at it, not its parent.

## B.     Tiptree Marine is a Necessary Party

Tiptree Marine is also a necessary party because resolution of the plaintiff's claims requires the Court to resolve the extent of contractual obligations allegedly owed by it, as well as its rights under the Marine LLC Agreement, the 2019 Bonus Plan and the Equity Incentive Plan. First, many of Mr. Kasselakis' claims revolve around the alleged failure of Tiptree Marine to issue equity to him—both Class B-1 Units and also what Mr. Kasselakis describes as Class A shares. Mr. Kasselakis

---

[8] One argument that Tiptree Parent can be expected to raise is that the Amendment effectuated a novation of the Employment Agreement, relieving it of any obligation under the Employment Agreement. *See Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 217 (E.D.N.Y. 2018) ("Under New York law, 'a novation is a new contract replacing and extinguishing a prior contract.' '[I]t is well-established that whether a novation exists depends on the parties' intention.' If the parties 'have manifested their intent on the face of the document, the court can make this determination as a matter of law.' But '[w]hen what the parties intended cannot be "definitely and precisely gleaned" from a reading of the contract, they should be afforded an opportunity to present extrinsic evidence to establish their intent.'") (internal citations omitted).

claims that he "suffered damages in the form of missing . . . equity . . . ," among other things. Complaint ¶ 190.  An award of damages that would compensate Mr. Kasselakis in kind for the alleged damages would require the issuance of units by Tiptree Marine.  The Marine LLC Agreement requires that the board of managers of Tiptree Marine approve any distribution of membership units, among other things.  Resolution of Mr. Kasselakis' claims will require a court to interpret the Marine LLC Agreement.

Second, resolution of Mr. Kasselakis' claims will require a court to resolve the scope of Tiptree Marine's obligations under the 2019 Bonus Plan and the Equity Incentive Plan.  Although Mr. Kasselakis attempts to frame his claims as arising solely under the Employment Agreement, the resolution Mr. Kasselakis' claims will require a court to evaluate the scope of Tiptree Marine's obligations under those plans.  Tiptree Marine is the only party to the 2019 Bonus Plan and the Equity Incentive Plan.  Both of those plan documents contain integration clauses providing that no other agreements—including, arguably, the Employment Agreement itself—provide for rights under the plans.  Both plans require that Mr. Kasselakis waive his rights to a jury trial in connection with the litigation of any claims arising under them; and the Equity Incentive Plan contains a mandatory venue provision requiring that litigation take place in a court located in Delaware, rather than in New York.  Mr. Kasselakis' request that this Court adjudicate Tiptree Marine's obligations transitively by reference to the Employment Agreement, rather than directly, prejudices Tiptree Marine by depriving it of the procedural protections—jury trial waiver and forum selection—built into those agreements.

Third, Mr. Kasselakis claims that his entitlement to "Class A shares" grows from an alleged agreement with Tiptree Marine's board of managers.  Complaint ¶ 155 ("Tiptree Marine's . . . Board promised Mr. Kasselakis over phone and email that . . . Tiptree Marine would grant Mr. Kasselakis 100% of the Class A shares . . . .").  Tiptree Marine reasonably claims an interest in litigating the

question of whether it indeed agreed to grant Mr. Kasselakis those shares.  Litigating that question will, again, require a court to evaluate the terms of the LLC Agreement and the Equity Incentive Plan, which contains rules regarding the issuance of units.

The Court cannot accord "complete relief" in Tiptree Marine's absence.  Judgment granting the plaintiff all of the relief that he seeks in this case will require Tiptree Marine to take action.  The board of Tiptree Marine has the sole discretion to award units, and to determine the amount of income subject to distribution under the 2019 Bonus Plan.  Even if, as the plaintiff argues, the Court can cause that action by injunctive relief directed at Tiptree Parent alone because it controls Tiptree Marine, the consequence of such an order will be to require "the [absent party] to do anything or change any of its positions."  *Peregrine Myanmar Ltd.*, 89 F.3d at 48.

### C. Tiptree Marine Florida is an Indispensable Party

Tiptree Marine Florida is an indispensable party:  after April 2022, Tiptree Marine Florida became Mr. Kasselakis' employer for all purposes under the Employment Agreement.  Therefore, allowing Mr. Kasselakis to litigate his claims under the Employment Agreement without Tiptree Marine Florida will substantially prejudice it.  In reaching this conclusion, the Court recognizes that "prejudice to absent parties approaches the vanishing point when the remaining parties are represented by the same counsel, and when the absent and remaining parties' interests are aligned in all respects."  *Marvel Characters Inc.*, 726 F.3d at 134.

But here, although Tiptree Marine Florida is a subsidiary of Tiptree Parent, the two companies' interests are not aligned in all respects.  Both Tiptree Parent and Tiptree Marine Florida are presumably aligned in desiring that Mr. Kasselakis' claims fail in their entirety.  But that is not the entire game:  the next question is which company should bear responsibility in the event that any liability is found.  With respect to this question, the interests of Tiptree Parent and Tiptree Marine Florida are not aligned.  Tiptree Marine Florida is not a wholly owned subsidiary of Tiptree Parent:

30

four other people and entities, including Mr. Kasselakis, are equity holders in Tiptree Marine, Tiptree Marine Florida's direct parent.

Tiptree Parent is motivated to take the position that any liability to Mr. Kasselakis under the Employment Agreement lies with its indirect subsidiary because any resulting liability would be borne in part by Mr. Kasselakis.  By attributing any liability to an indirect subsidiary, Tiptree Parent can take the position that its assets are sheltered from judgment.  Tiptree Marine Florida, by contrast, has an interest in attributing liability to Tiptree Parent.  Although Tiptree Marine Florida is a subsidiary of Tiptree Parent, the companies' interests are not aligned with respect to the effect of the Amendment and the allocation of liability under the Employment Agreement.  Tiptree Marine Florida's interests will be prejudiced if it is not party to a litigation that seeks to establish a breach of contractual obligations under the Employment Agreement, which made Tiptree Marine Florida Mr. Kasselakis' "Employer."

The prejudice to Tiptree Marine Florida cannot be fully alleviated.  Only by bringing Tiptree Marine Florida into the case will it and its counsel have the opportunity to develop the company's legal position in the litigation.  The Court cannot order Tiptree Parent to take a position adverse to its corporate interests.

A judgment in the absence of Tiptree Marine Florida would not be adequate.  Again, that is largely because Tiptree Marine Florida became Mr. Kasselakis' "Employer" for all purposes under the Employment Agreement after April 2022.  No party has presented a theory regarding how Mr. Kasselakis can recover damages from Tiptree Parent for obligations owed to him by Tiptree Marine Florida.  Without Tiptree Marine Florida, the Court cannot envision how complete relief would be afforded to Mr. Kasselakis for the claims that he is pursuing in this case.[9]  Mr. Kasselakis fairly posits

---

[9] Mr. Kasselakis' desire to structure this case as a claim against Tiptree Parent, rather than Tiptree Marine Florida is understandable.  He seeks to assert a direct claim against a parent company for obligations owed by its subsidiary, circumventing the protections afforded to the parent company by virtue of the fact that it is a different corporate entity.

that Tiptree Parent can cause Tiptree Marine to issue the units that he claims to have been withheld from him if Tiptree Parent is found liable because Tiptree Parent controls Tiptree Marine.  But Tiptree Marine Florida is Tiptree Marine's subsidiary; Mr. Kasselakis—reasonably—does not argue that Tiptree Marine Florida can cause its parent to do anything.

The plaintiff will have an adequate remedy if the Court dismisses this action.  Mr. Kasselakis can pursue his claims in state court.  This result makes profound sense in this case.  Mr. Kasselakis appears to have structured his claims in what can generously be described as a convoluted manner in order to be able to bring this case in federal court.  Mr. Kasselakis' claims are founded on alleged failures by Tiptree Marine to pay him, but rather than suing Tiptree Marine directly, he has pursued his claims indirectly as claims against Tiptree Parent under the Employment Agreement.  He chose not to name Tiptree Marine Florida, which is a party to the agreement that he alleges to have been breached.  He chose not to name Tiptree Marine, the company for which he served as CEO, and the company whose operations, results, and contracts lie at the heart of Mr. Kasselakis' claims.

The Court grants due weight and deference to the plaintiff's choice of forum in this case.  But in weighing whether "in equity and good conscience," the action should proceed among the existing parties or should be dismissed, the contortions required for the plaintiff to structure his claims to exclude Tiptree Marine and Tiptree Marine Florida from the case are weighty considerations in favor of dismissal.  Pursuing the case in state court will permit the participation of all of the relevant parties and permit the parties to litigate the issues presented in the case in an efficient way.  Proceeding with the case in federal court requires a convoluted dance around the parties and contracts at the heart of the case.  Equity and good conscience lead to the conclusion that it is better for the case to proceed in state court, where it can proceed in a more straightforward manner.

**D.  Tiptree Marine is Not an Indispensable Party**

Tiptree Marine is not an indispensable party because its interests are not substantially impaired in its absence.  Mr. Kasselakis' claims require the court to determine the scope of Mr. Kasselakis' rights under the Equity Incentive Plan and the 2019 Bonus Plan.  Tiptree Marine will be prejudiced if litigation centered around the contracts to which it is a party proceeds without it.  The degree of prejudice, however, is very limited.  The Court understands that Tiptree Marine is represented by the same counsel as Tiptree Parent in a parallel proceeding being litigated in the Delaware Court of Chancery.  Declaration of Daniel M. Eisenberg, Dkt. No. 53, ¶¶ 4–5.  And Mr. Kasselakis reasonably argues that the interests of Tiptree Parent and Tiptree Marine are aligned "because Tiptree and Mr. Kasselakis have a zero-sum relationship with respect to ownership of equity in Tiptree Marine . . . ."  Opp. at 8.  While there is some prejudice to Tiptree Marine as a result of its absence here, that prejudice is very limited.[10]

The relief requested by the plaintiff would be more readily available in an action to which Tiptree Marine was a party.  The plaintiff asks for the issuance of equity units in Tiptree Marine.  If Tiptree Parent were a party, the Court could enter injunctive relief requiring the company to issue the missing units.  *See Associated Dry Goods Corp. v. Towers Fin. Corp.*, 920 F.2d 1121, 1124 (2d Cir. 1990) (finding an absent party to be indispensable in its absence the claimant could not obtain "full injunctive relief").  However, this factor does not weigh heavily in favor of finding Tiptree Marine to be indispensable, because injunctive relief directed at Tiptree Parent could require it to direct action by the members of Tiptree Marine's board of managers, which it is alleged to control.

---

[10] Tiptree Marine is harmed by the framing of the plaintiff's claims as claims for breach of the Employment Agreement, rather than as direct claims for breach of the 2019 Bonus Plan and the Equity Incentive Plan.  Both of those agreements contain procedural safeguards for Tiptree Marine that the Employment Agreement lacks—principally the mandatory forum selection clause in the Equity Incentive Plan and the agreements' choice of law provision.  But that fact does not weigh heavily in the Court's assessment of prejudice.  Among other things, Tiptree Parent has raised arguments about the mandatory forum selection clause in its briefing of this motion, which demonstrates that it can effectively advocate for Tiptree Marine's rights under those agreements.

The plaintiff would have an adequate remedy if the Court dismissed this action.  Again, these same claims can be readily pursued in state court.  The state court proceedings can proceed without the need for the contortions in the presentation of the plaintiff's complaint required to achieve diversity jurisdiction.

On balance, the Court does not conclude that Tiptree Marine is an indispensable party to this action.  Unlike Tiptree Marine Florida, the Court does not conclude that the defendants have shown that nonjoinder of Tiptree Marine would make the just resolution of the action impossible.  But while the limited prejudice to Tiptree Marine of proceeding in its absence would not, on its own, lead the Court to dismiss the action, it supports the Court's determination that equity and good conscience require the dismissal of this action.  That weight is not dispositive—the Court would dismiss the action based solely on the prejudice to Tiptree Marine Florida alone.  But dismissal of the action will also lead to the reduction of some prejudice to Tiptree Marine and allow the parties to litigate the issues presented by Mr. Kasselakis in a more comprehensive, and direct, way—with all parties to the dispute before the court, and all cards on the table.

## IV.      Conclusion

Because Tiptree Marine Florida is a necessary and indispensable party whose joinder destroys diversity, the defendants' motion to dismiss is GRANTED.  This action is dismissed without prejudice.

The Clerk of Court is directed to terminate all outstanding motions, to enter judgment for the defendants, and to close this case.

SO ORDERED.

Dated:  July 1, 2024
New York, New York

_____
GREGORY H. WOODS
United States District Judge

34